Filed 2/22/21  Yang v. Hsiao CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SHIN P. YANG,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>    v.<br><br>WANG CHIEN EGO HSIAO et al.,<br><br>    Defendants, Cross-complainants and Appellants. | B302443<br><br>(Los Angeles County Super. Ct. No. BC648006) |

APPEALS from a judgment of the Superior Court of Los Angeles County.  William D. Stewart, Judge.  Affirmed.

Pierry Law Firm, Joseph P. Pierry, Law Offices of Shin P. Yang and Frank Carleo for Plaintiff, Cross-defendant and Appellant.

Marshall & Associates and Robert O. Marshall for Defendants, Cross-complainants and Appellants.

After an attorney obtained a default judgment of $255,056 for a motel employee in a wage and hour employment action, the attorney learned that his client's former employer had contacted the client directly and induced him to sign a settlement for $20,000 without notifying the attorney, after the entry of default and filing of the damages statement. The employer subsequently cross-complained against the employee for not timely dismissing the case under the terms of the settlement agreement, assisted the employee to dismiss his own action and substitute in for the attorney as a self-represented litigant, then obtained a default judgment of $13,899 against the now-unrepresented employee.

The attorney, who had been retained on a contingency fee basis, sued the employer for interference with contractual relations. The trial court awarded the attorney $103,948 in compensatory damages and $100,000 in punitive damages.

The employer appeals the trial court's judgment in favor of the attorney. The attorney cross-appeals the award of punitive damages on the grounds that the trial court improperly discounted the award by considering the employers' status as an individual as opposed to a business entity. We affirm the trial court's judgment, including the award of punitive damages.

## FACTUAL AND PROCEDURAL HISTORY

The basic facts of this case are not in serious dispute. "In the few areas of disagreement we accept, as we must, the findings of the trial judge who, after a careful hearing, made a thorough and well prepared record and statement of decision." (*Bouvia v. Superior Court* (1986) 179 Cal.App.3d 1127, 1135.)

A. **The Hang Wage and Hour Action**

Ms. Wang Chien Ego Hsiao and Mr. Long Tzong Syiau are a married couple who operate the Champion Motel in San

2

Gabriel. On August 31, 2015, Attorney Shin P. Yang filed a wage and hour action against the Champion Motel, Hsiao, and Syiau on behalf of his client William Hang, who had worked at the Champion Motel since June 2010.

Hang had retained Yang on a contingency fee basis to pursue his wage and hour claims. The retainer agreement provided, among other things, that Yang would receive a fee of 40 percent of the gross recovery after litigation commenced, and granted an attorney fees lien to Yang for his reasonable services should he be discharged prior to concluding the case.

On October 6, 2015, Yang served a statement of damages on the Champion defendants by mail, pursuant to Code of Civil Procedure section 425.11, subdivision (c). Hang stated damages of $300,000 in general damages, $300,000 in special damages, and $600,000 in punitive damages. On October 13, 2015, having received no response to the complaint, Yang filed a request for entry of default along with the statement of damages, and default was entered. On October 21, 2015, Hang executed a declaration in support of default judgment, describing working 14-hour days five days a week without breaks or overtime, for $905 per month—far below minimum wage—and seeking $787,465 in damages. This was filed with the court October 26, 2015.

Unbeknownst to Yang, Hsiao contacted Hang and met with him in mid-October 2015, and convinced him to sign a $20,000 settlement agreement. In a declaration filed by Hang in opposition to an unsuccessful subsequent motion by Hsiao to enforce the settlement, Hang stated that Hsiao met him for tea and told him she felt sorry for having underpaid him. She promised to "make up" for his loss by loaning him $20,000, knowing he needed money. They met again later in October and

3

Hsiao brought a document for him to sign, telling him it was a "receipt" for the loan while holding $20,000 cash. Hang told her he could not read the paper in English, especially with all the legal terms he did not understand. Hsiao told him, "don't worry," assured him it was just a "receipt," and promised to give him more money in the future. Hang needed the money to support his family and three daughters, so he signed the agreement and Hsiao gave him the $20,000 cash.

The three-page settlement agreement was dated October 23, 2015, and executed by Hang and Hsiao. In relevant part, it provided that "Defendants, and each of them individually, agree to pay the amount of $20,000, jointly payable to the Plaintiff's Attorney and Plaintiff," no later than one week after execution of the document. It set forth a comprehensive mutual release of all claims, and provided that upon execution and payment Hang would "file a dismissal with prejudice of the entire Subject Action," including against Syiau, who did not execute the agreement. The agreement was drafted by Ms. Hsiao's daughter, a certified public accountant; the trial court found it "shows a considerable degree of sophistication."

Yang was not jointly paid any of the settlement amount and would not learn of the October 23 settlement agreement until August 2016, nine months later. No notice of settlement or request for dismissal was filed around the time the agreement was signed.

In the meantime, Yang continued to work on Hang's wage and hour action, including submitting briefing on statute of limitations issues at the request of the trial court. Both sides were served with the trial court's request for this briefing on

4

November 9, 2015. Yang filed and served a memorandum on statute of limitations on January 27, 2016.

On January 26, 2016, Hang signed a declaration in support of application for default judgment, seeking $255,056.50 in damages. On January 28, 2016, Yang filed a request for judgment with the trial court, along with Hang's declaration and supporting documentation.

On January 29, 2016, the trial court issued a default judgment for Hang in the sum of $255,056.50.

In April 2016, Hsiao took Hang to a notary public and had him re-sign the settlement agreement and a request for dismissal in front of a notary.

In August 2016, Yang filed an application for a debtor's examination of Hsiao to enforce the judgment, and a hearing was scheduled for September 9, 2016. Shortly thereafter, Yang received a letter from Hsiao's counsel informing him of the settlement and attaching a copy of the agreement, which Yang had not known existed until then. Yang met with Hang the next day, and Hang showed him copies of the settlement agreement, an unfiled substitution of attorney form dated January 28, 2016, and a notarized unfiled request for dismissal dated January 29, 2016, which Hang stated he had signed all in exchange for money from Hsiao. Hang told Yang—who was aware Hang could not read English—that he didn't know what the documents were and that no one had explained them to him.

On October 4, 2016, Hsiao filed an ex parte application to set aside the judgment, enforce the settlement agreement, and dismiss the entire case with prejudice. Yang opposed the application, with a supporting declaration from Hang describing

5

Hang's experience with Hsiao inducing him to sign the agreement.

On October 7, 2016, the trial court denied Hsiao's application except that it set aside the default judgment (but not the default) on procedural grounds because the original complaint had not stated a specific amount of damages sought and default judgments may not exceed the amount stated in the complaint pursuant to Code of Civil Procedure section 580, subdivision (a).

On December 8, 2016, Yang filed an amended complaint.

Defendants filed an answer to the amended complaint on January 13, 2017, as well as a cross-complaint against Hang for breach of the settlement agreement, breach of the implied covenant of good faith and fair dealing, and fraudulent and negligent misrepresentation for not dismissing the case within a week after settlement.

On January 23, 2017, Hang filed a substitution of attorney substituting himself in place of Yang as a self-represented party and filed a request for dismissal with prejudice of the complaint but *not* of the cross-complaint (although, as the trial court noted in the underlying statement of decision here, the box for "Entire action of all parties and all causes of action" appeared to have originally been checked and then whited out).

Defendants continued pursuing their cross-compliant against Hang and ultimately obtained a default judgment against Hang on September 20, 2017, in the amount of $13,899.35.

## B.    The Yang Intentional Interference Action

On January 24, 2017, Yang sued Hsiao, Syiau, and Hang for intentional interference with contractual relations, civil conspiracy, and intentional and negligent interference with

prospective economic relations. The case proceeded to a four-day bench trial on the single issue of intentional interference with contract against Hsiao and Syiau.[1]

After conclusion of trial and posttrial briefings, the trial court issued a detailed 17-page statement of decision. The trial court found Hsiao's testimony incredible, concluded that Yang had proved intentional interference with contractual relations, and awarded actual damages of $102,022 (based on 40 percent of the default judgment obtained in the Hang action), $1,926 in litigation costs advanced by Yang in the Hang action, and $100,000 in punitive damages against Hsiao, individually and as Syiau's agent.

This appeal and cross-appeal followed.

## DISCUSSION

### I.    Interference With Contract

Hsiao contends that no evidence supported the award of damages for intentional interference with contract. Where a party challenges the sufficiency of the evidence to support a judgment, "we apply the substantial evidence standard of review. [Citations.] In applying this standard, we 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor.' " (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1096.) We review claims of law, and the application of law to facts, de novo. (*Yumori-Kaku v. City of Santa Clara* (2020) 59 Cal.App.5th 385, 409–410.) On review, we conclude that there was substantial evidence to support the judgment and that the trial court did not err in concluding that

---

[1] Hang died before trial and was dismissed from the case.

7

Hsiao intentionally interfered with the contract between Yang and his client Hang.

### A. Relevant Legal Principles

The elements of a cause of action for intentional interference with contractual relations are (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1141 (*Biogen*).)

Our Supreme Court has recently held that actions for intentional interference with at-will contracts also require some "independent wrongful act" apart from just the interference with the contract itself, as is required for the related tort of intentional interference with prospective economic advantage. (*Biogen*, *supra*, 9 Cal.5th at pp. 1140–1148.) This is because, "[l]ike parties to a prospective economic relationship, parties to at-will contracts have no legal assurance of future economic relations. [Citation.] An at-will contract may be terminated, by its terms, at the prerogative of a single party, whether it is because that party found a better offer from a competitor, because the party decided not to continue doing business, or for some other reason. And the other party has no legal claim to the continuation of the relationship. The contracting parties presumably bargained for these terms, aware of the risk that the relationship may be terminated at any time. At-will contractual relations are thus not cemented in the way that a contract not terminable at will is." (*Id.* at p. 1147.)

8

## B. Independent Wrongful Act Requirement

Hsiao contends that *Biogen*'s independent wrongful act requirement is applicable to actions for interference with attorney contingent fee agreements because the client can terminate the agreement for any reason at any time. (See *Fracasse v. Brent* (1972) 6 Cal.3d 784, 790 ["a client should have both the power and the right at any time to discharge his attorney with or without cause"].)

However, *Biogen* does not specifically address contingent fee agreements, and longstanding Supreme Court authority not discussed or repudiated by *Biogen* states that "[a]n attorney's interest in his contingent fee agreement *is greater than that of a party to a contract terminable at will*, as to which it has been held that an intentional and unjustifiable interference is actionable." (*Herron v. State Farm Mut. Ins. Co.* (1961) 56 Cal.2d 202, 206, italics added (*Herron*) [holding that an action may lie for intentional interference with an attorney's contingent fee agreement under then-existing rule which did not distinguish between intentional interference with contract and intentional interference with prospective economic advantage].)[2] Contingent fee attorneys have an interest in their reasonable fees up to the point of termination of their service by the client (*Fracasse v. Brent, supra*, 6 Cal.3d at p. 792) and an interest in their percentage fee that accrues when settlement or recovery occurs

---

[2] As noted in *Biogen*, only since our Supreme Court's decision in *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376 has there been " 'a sharpened distinction between claims for the tortious disruption of an existing contract and claims that a prospective contractual or economic relationship has been interfered with.' " (*Biogen, supra,* 9 Cal.5th at p. 1142.)

9

(*ibid.*)—a constructive attorney lien that provides "a *security interest* in the *proceeds* of the litigation" (*Isrin v. Superior Court of Los Angeles County (*1965) 63 Cal.2d 153, 158). Given these interests of an attorney party to a contingent fee agreement (and such agreement's nonreciprocal nature, in that the attorney may not terminate at will), Yang contends that *Biogen*'s independent wrongful act requirement for at-will contracts is not applicable to actions for interference with attorney contingent fee agreements. We conclude it appears to be an open question whether an independent wrongful act is required for interference with an attorney's contingent fee agreement *post-Biogen*.

However, we need not determine whether an independent wrongful act is in fact required because in any event Hsiao's failure to jointly pay the settlement to Yang along with his client was a sufficient independent wrongful act.

" '[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.' " (*Biogen, supra,* 9 Cal.5th at p. 1142, quoting *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159.) Here, the settlement by its own terms directed that the settlement funds be "jointly payable" to Hang *and his attorney*—i.e. Yang—within one week. Where the terms of a settlement agreement " ' "necessarily require the promisor to confer a benefit on a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person." ' " (*Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1299.) Third-party beneficiaries may sue for breach of contract under contracts that have a "motivating purpose" of benefiting them (*Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 821), and "broken promises of

10

future conduct" may be actionable for intentional misrepresentation, as in an action for deceit based on a false promise. (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158–159; see Civ. Code, § 1710, subd. (4) [deceit is "[a] promise, made without any intention of performing it"].)

By paying the entire sum of $20,000 to Hang in cash when he signed the settlement agreement, Hsiao plainly indicated that she had no intention of paying Yang any amount of the settlement in the future. We conclude that Hsiao's failure to jointly pay Yang along with Hang was hence an independently wrongful act proscribed by law, which affected Yang as a third-party beneficiary of the settlement agreement. Because we conclude that this act alone was independently wrongful, we need not determine whether any other acts by Hsiao constitute an independent wrongful act.

## C.   Valid Contract, Knowledge of Contract, and Intentional Acts Disrupting It

Substantial evidence supports the next elements of intentional interference with contract. Hsiao conceded at trial that the retainer agreement was a valid contract between Yang and Hang and that at the time of the settlement agreement she knew Hang was represented by Yang.[3] Hsiao argues that she was unaware of the precise details of their attorney-client agreement and was primarily pursuing her own interests, but a plaintiff in an intentional interference with contract action need not establish that the primary purpose of the defendant's actions was to disrupt the contract. Rather, interference is established even where " 'the actor does not act for the purpose of interfering

---

[3] As the trial court noted, Hsiao evaded admitting that she knew Hang was represented until her response brief at trial.

11

with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his [or her] action.' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 56, quoting Rest.2d Torts, § 766, com. j, p. 12.) Here, Hsiao's acts were intentional and designed to induce a breach or disruption of the contractual relationship between Hang and Yang. She concedes that she approached Hang with the intention of obtaining a settlement; as discussed, she obtained his signature through the independent wrongful act of misrepresenting the nature of the document to a financially vulnerable individual and executing a document promising joint payment to Hang and his attorney—which she never jointly delivered to Yang.

We conclude there is substantial evidence that Hsiao knew that a signed settlement would interfere with Hang's agreement for Yang to litigate his wage and hour case, and that not jointly paying as promised in the agreement would interfere with their financial agreement, whatever the details might be.

Hsiao argues that she did not actually interfere with their contractual relationship because Yang continued representing Hang for many months after the settlement agreement. However, Yang's continued efforts on behalf of Hang until August 2016 were because he was unaware there had been any settlement because of the confounding effect on Hang of Hsiao's misrepresentations as well as Hsiao's failure to jointly pay Yang under the settlement, which would have alerted him to its existence. Thereafter, he worked to try to dismiss the settlement and enforce the default judgment on behalf of his client, until Hang, presumably under Hsiao's coaching, dismissed his action and substituted in as his own attorney in January 2017. We

conclude that there is sufficient evidence that their contractual relationship was significantly disrupted by Hsiao's actions. "The plaintiff need not allege an actual breach, but only interference with or disruption of his or her contractual relations." (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 344.)

D.   **The Trial Court's Actual Damages Award Was Proper**

Hsiao levies a variety of arguments against the trial court's finding of damages and damages award. Hsiao contends that the trial court erroneously awarded Yang contract damages in a tort action; erred in awarding damages based on Yang's anticipated contingency fee; failed to consider the effect of the settlement, amended complaint, and Hang's dismissal with prejudice of the underlying action; and failed to follow Judge Matz's order finding the prior default judgment to be void.

We find each of Hsiao's contentions unavailing.

As Hsiao concedes, an attorney may bring a damage claim against a third party who induces the attorney's client to terminate the attorney-client relationship by unlawful means, despite the client's unilateral right to terminate the agreement at any time. (See *Herron*, *supra*, 56 Cal.2d at p. 206; *Abrams & Fox, Inc. v. Briney* (1974) 39 Cal.App.3d 604, 608.) In *Fracasse v. Brent, supra,* 6 Cal.3d 784, our Supreme Court held that "a discharged attorney" is entitled to "the reasonable value of the services he has rendered up to the time of discharge. In doing so, we preserve the client's right to discharge his attorney without undue restriction, and yet acknowledge the attorney's right to fair compensation for work performed." (*Id.* at p. 791.) This entitlement, while based in contract, can support damages for two different causes of action: Although an attorney's action

13

against his *client* sounds in contract—"whether it be upon the written contingency agreement or on the quasi-contractual obligation to pay the reasonable value of services rendered before the breach," "[t]he present action is in tort, seeking damages against a third party for wrongfully inducing breach of a valid attorney-client relationship." (*Trembath v. Digardi* (1974) 43 Cal.App.3d 834, 837.) Contract damages were not awarded here.

The trial court also did not err by accepting the default judgment in the Hang action as the proper measure of damages. "[A]n attorney who is wrongfully discharged is generally entitled to the same amount of compensation as if he had completed the contemplated services." (*Herron, supra,* 56 Cal.2d at p. 205; see *Little v. Amber Hotel Co.* (2011) 202 Cal.App.4th 280, 304 [defendant liable for all harm flowing from its conduct in interfering with attorney's retainer agreement].) Here, Yang *did* complete his contemplated services and obtained a substantial judgment for his client. The settlement, as discussed, was procured through an independently wrongful act, through no work of Yang's, thus provides no alternate basis for measure of his damages. Although Yang presented extensive evidence of damages at trial (and Hsiao proffered no credible evidence that any figures were excessive), the trial court found that "the best measure of damages here are the findings and award of Judge Matz in the [Hang] default judgment," noting that "[i]t is readily abundant that the judgment received appropriate judicial review and consideration." The trial court was entitled to adopt the figures previously vetted by the trial court in the Hang action, despite the fact that the default judgment was not enforceable. That the default judgment was unenforceable or that the action was ultimately dismissed with prejudice pursuant to the

14

settlement agreement does not moot Yang's claims of economic damages—indeed, it is precisely the evaporation of Yang's fully realized judgment figure that provides the basis for his damages.

## II.     The Punitive Damage Award Was Proper

Having concluded that the trial court's damages award was not improper, we next address the $100,000 award of punitive damages.

On appeal, Hsiao contends that the evidence was insufficient to support a punitive damages award and that the award was excessive and improperly based on the perceived harm to Hsiao's employee Hang, as opposed to harm to Yang. On cross-appeal, Yang contends that the trial court improperly discounted the appropriate amount of punitive damages by factoring Hsiao's status as an individual, as opposed to a corporation, into its punitive damages determination.

We conclude that punitive damages were proper and affirm the trial court's award and determination of punitive damages.

### A.     Substantial evidence supports the trial court's finding that Hsiao engaged in conduct warranting punitive damages

We review the evidence supporting punitive damages under the substantial evidence standard. (*Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 34.) Punitive damages are permissible on a showing of conduct amounting to "oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) Our substantial evidence review proceeds in light of the clear and convincing standard of proof applicable at trial, considering whether the record as a whole contains substantial evidence from which a reasonable trier of fact could have found clear and convincing evidence of " 'oppression, fraud, or malice' " that allows for the

15

imposition of punitive damages.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 999; Civ. Code, § 3294, subd. (a).)

There was sufficient evidence in the record that Hsiao engaged in fraudulent and/or malicious conduct resulting in Yang's harm.  Because of her misrepresentations and his poor English, Hang was unaware he had signed a settlement and continued litigating his case with Yang.  Although the agreement purported to be jointly payable to Hang and his attorney within a week of execution, Yang was never paid anything by Hsiao thereunder.  Hsiao's misrepresentations and false promises directly led to Yang's harm and constitute sufficient evidence of conduct amounting to oppression, fraud, or malice to support punitive damages.

**B.     The punitive damages award was not excessive**

Courts weigh three factors or "guideposts" in determining whether punitive damages are constitutionally excessive:  (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm to the plaintiff and the punitive damages award; and (3) the difference between the punitive damages award and any comparable civil penalties. (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171–1172 (*Simon*); *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 418 (*State Farm*); *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1222–1223; see CACI No. 3940.)  We review the award de novo, making an independent assessment of the factors.  (*Simon,* at p. 1172.)  Where, as here, the parties identify no corresponding civil penalties, we consider only the first two factors.  (*Tilkey v. Allstate Ins. Co.* (2020) 56 Cal.App.5th 521, 559.)

16

" '[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' " (*State Farm, supra,* 538 U.S. at p. 419.) Courts " 'determine the reprehensibility of a defendant by considering whether:  the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.' " (*Simon, supra,* 35 Cal.4th at p. 1180, quoting *State Farm, supra,* at p. 419.)

Here, although the harm was not physical or in disregard of health or safety, Hsiao accomplished the relevant harm to Yang by targeting a financially vulnerable individual, his client Hang, whom she knew needed cash.  There also is evidence that she convinced Hang to sign the settlement agreement through intentional deceit, including telling him she would "loan" him $20,000, presenting him a document in English which he could not fully read and telling him the document was merely a "receipt" for the promised "loan."  And although she promised under the settlement agreement to pay the settlement "jointly" to Hang and his attorney, Hsiao never sent Yang any portion of the money.  The making of these intentionally false representations and promises indicates intentional deceit rather than "mere accident." (*State Farm, supra,* 538 U.S. at p. 419.)  Hsiao's affirmative misrepresentations and false promises show she "was not merely indifferent to, but actively sought an injury to" Yang's rights.  Overall, the subfactors weigh on the side of moderate reprehensibility.

17

There is little disparity between the punitive damages award and actual damages. The $100,000 in punitive damages is slightly under a 1:1 ratio to the amount of compensatory damages and is within the constitutionally permitted range in view of the degree of reprehensibility of Hsiao's conduct.

### C. The punitive damages award was not improperly determined

We reject Hsiao's contention that the punitive damages award was improperly awarded for harm to a third party. The trial court expressly stated in its statement of decision, albeit with some regret, that its punitive damages award was limited to the harm to Yang. The trail court noted that Hsiao's violation of her employee Hang's rights, as well as "harming the civil justice system," were circumstances justifying punitive damages; and that "the greater victim" of Hsiao's actions was Hang himself. However, the trial court explained that although Hsiao's conduct "was reprehensible in many ways and harmful to more than one person, the reprehensibility as reflected in the punitive damages award is to be measured by the harm done to the plaintiff alone," namely, proceeding in derogation of Yang's rights and depriving him of his fees for legal services, "as well as violating the provision of the settlement agreement with Mr. Hang which required [Hsiao]'s endorsement of the settlement funds to Mr. Hang." Despite its suspicions that Hsiao's machinations were motivated by the desire to maintain her workforce under exploitative conditions, the trial court explained that "the law does not provide a basis for an award of punitive damages to one person based upon injury to others," "[t]here is no provision for the affront to the legal system as it exists for the benefit of the entire civil order," and "there is no possible provision for the

18

continuing harm suspected to continue to occur to defendants' employees."

Although the trial court noted its suspicion that Hsiao was an unscrupulous employer, and considered her oppression of Hang and abuse of the court system part of the reprehensibility of her actions that harmed Yang and that it wished to deter, it made clear that its punitive damages award solely reflected the conduct that harmed Yang. (See *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1204 [" '[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business' "].)

We also reject Yang's contention on cross-appeal that the trial court went beyond the permitted factors of consideration in its determination of punitive damages.

Yang specifically takes issue with this language in the trial court's statement of decision, rejecting Yang's proposed higher amounts: "Suggestions of amounts by plaintiff herein seem more appropriate to corporations, where the specific act constituting the tort is likely to be part of a pattern of conduct carried on by a large economic actor. Punitive verdicts from juries against individual defendants, in this court's experience have been more closely aligned with actual damages." Yang contends that given the reprehensibility of Hsiao's conduct and her stipulated financial condition of $9 million, the punitive damages award would and should have been far greater had the trial court not considered her as an individual rather than a corporate defendant. Yang argues that a punitive damages award of

$1 million is more appropriate and asks us to remand for redetermination.

We find no error with the trial court's statement and ultimate determination in this regard.  The trial court's analysis hinged not on whether Hsiao was an individual or corporate actor, but on whether there was a pattern or practice of the specific behavior justifying punitive damages, a valid consideration.  "A pattern or practice of wrongful conduct is often introduced as evidence of malice or oppression to justify a punitive damage award," and a court may "properly consider[] the absence of evidence of similar practices as a relevant factor" in determining whether a punitive award amount is excessive. (*George F. Hillenbrand, Inc. v. Insurance Co. of North America* (2002) 104 Cal.App.4th 784, 820–821.)

Although Hsiao may well have a pattern of exploiting workers across her business entities (as Yang suggests should be considered), there was no proof of this offered, nor is it relevant to the singular and specific acts constituting Hsiao's tort of interference with contractual relations against Yang.  The trial court expressly stated that despite its suspicions that Hsiao subjected her larger workforce to substandard employment terms—for which the larger punitive amounts sought by Yang "could have been entirely appropriate in amount"—"[t]hese suspicions cannot form the basis for an award."  Rather, it had to be measured by the harm done by Hsiao to Yang alone, for which the trial court concluded that a punitive damages award closer to a 1:1 ratio was more appropriate.  The trial court has "considerable discretion" to impose punitive damages within a constitutional range, as it did here.  (*Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 563, fn. 9; see *McGee v.*

20

*Tucoemas Federal Credit Union* (2007) 153 Cal.App.4th 1351, 1362.)  Accordingly, we will not disturb its determination.

Finding no error, we affirm the trial court's award of punitive damages.

## DISPOSITION

The judgment is affirmed.  Yang is awarded costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.