445 So.2d 365 (1984)
In re GUARDIANSHIP OF Andrew James BARRY, a Minor.
No. 83-2230.
District Court of Appeal of Florida, Second District.
January 27, 1984.
*367 E.J. Salcines, State Atty., and Joryn Jenkins and Claire L. Cours, Asst. State Attys., Tampa, for appellant.
Anthony B. Marchese, Tampa, for appellees Mark and Laura Barry.
Barbara Pankau of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, for amicus curiae Women's Hosp.
SCHEB, Judge.
On appeal by the state, we review a trial court order authorizing removal of a life support system from Andrew James Barry, the infant son of Mark and Laura Barry. We affirm.
These proceedings were initiated by Mr. and Mrs. Barry, the child's natural parents. After their appointment as legal guardians of Andrew, they petitioned for approval to terminate the use of his life support system. They alleged that their child was in a chronic permanent vegetative coma, absent cognitive brain function, and terminally ill. Further, they alleged that Andrew had no independent respiratory function and, should the ventilator sustaining his life be removed, he would expire in a matter of hours. Their petition was accompanied by supporting affidavits of three physicians who had examined and attended the infant and who concurred in their decision.
A guardian ad litem, appointed by the court, filed a report concurring in the conclusion *368 of the three physicians. He recommended that the parents' petition be granted on the assumption that the infant, if competent to make the decision on his own, would exercise his judgment to terminate the life support system. The state attorney, however, denied the allegations, demanded strict proof, and prayed that the petition be dismissed.
Counsel for the petitioners, the state, and the Humana-Women's Hospital where the child is an inpatient, appeared at an evidentiary hearing along with the guardian ad litem and the parents. The court heard testimony from the parents and from the three physicians.
At the conclusion of the hearing, the trial court took the matter under advisement. Three days later, on October 21, 1983, the court announced the following findings:
1. Andrew James Barry was born on December 25, 1982 and is approximately ten months old. He is presently at Women's Hospital, Tampa, Florida and is on a ventilator life support system in a permanent vegetative state with in excess of 90 per cent of his brain function gone and is without cognitive brain functioning. He has been on the ventilator life support system since about 36 hours following birth. However, death cannot be determined under the standard set forth in F.S. 382.085 because there has not been irreversible cessation of the functioning of the entire brain there being some minimal functioning in the brain stem. The child is terminally ill and even if the life support system was maintained he could not reasonably be expected to live much beyond two years. He has no independent respiratory functions and if the life support system is removed the child will die within an estimated one-half to two hours. His condition is permanent and irreversible.
2. Under the facts established in this case the ventilator life support system is an extraordinary life prolonging measure.
3. That the natural parents, legal co-guardians, have consulted with attending physicians, family members, grandparents and priests and each other and feel that the ventilator is an extraordinary measure and that the best interest of Andrew required that it be discontinued and removed.
4. The Court appointed Guardian Ad Litem for Andrew James Barry has filed a Report and concluded that if Andrew James Barry were competent to make such a decision his decision would be to terminate the life support systems. The Guardian Ad Litem has therefore recommended that the petition be granted.
5. The Office of the State Attorney advanced the interests of the State of Florida in obtaining a denial of the subject petition but this Court expressly finds that the interests of the State of Florida in having the petition denied are far outweighed by the facts in this case and Andrew James Barry's right to privacy notwithstanding the fact that such right is recognized on the basis of substituted judgment and in the absence of any evidence of intention. Satz v. Perlmutter, 379 So.2d 359 (Fla.) and 362 So.2d 160 (Fla.App.) and cases cited therein.
6. The standard set forth in F.S. 382.085 is not the exclusive standard for determining death or for the withdrawal of life support systems. John F. Kennedy Memorial Hospital v. Bludworth, 432 So.2d 611 at page 619 (Fla.App.).
7. The costs of care for Andrew James Barry have been and will continue to be fully covered by insurance. It was also established by the testimony of the doctors in this case that had they known at the time the respirator was first ordered what they now know the respirator would not have been ordered. Further, the possibility *369 of legal or criminal liability prevented their termination of the life support at this time without Court Order.
On that same date the court entered an order authorizing the parents to cause the ventilator life support system to be terminated and to instruct the attending physicians not to furnish life-sustaining procedures thereafter, except for the sole purpose of alleviating the child's pain and suffering and to keep him comfortable and provide him with normal nutrition. Finally, the court ordered that no person acting in accordance with its order would be held civilly or criminally responsible.
This appeal by the state ensued, with the trial judge's order stayed pending resolution by this court.
This appeal vividly demonstrates the tragedy of a comatose infant with a severe birth defect being kept alive only by extraordinary medical measures. While this type of problem is not new, it is one that is viewed today from a new perspective as dramatic advances in medical technology have made it possible to sustain life in many infants who would otherwise have died at birth. As a consequence, parents and medical personnel now face some very real moral and ethical judgments on the issue of life and death.
The law has begun to respond to this new technology. For example, in 1980 the legislature enacted section 382.085, Florida Statutes, to recognize "brain death" under certain circumstances.[1] In some states legislatures have enacted laws allowing competent individuals to refuse application of extraordinary medical or surgical means to prolong life, and one state even allows either parent of a minor to execute a refusal on behalf of the minor.[2]
While Florida has defined brain death, Andrew does not fully meet the necessary criteria because there is a minimal function of his brain stem. Section 382.085(4), however, recognizes that the statutory recognition of brain death "is not the exclusive standard for determining death or for the withdrawal of life-support systems." Moreover, while there is legal precedent to allow a competent individual to order removal of life support systems, there are no Florida statutes or controlling judicial precedents which address the removal of life support systems from a minor. Thus, after arriving at what they considered an informed and moral judgment, Mr. and Mrs. Barry petitioned the circuit court to sanction their decision.
The state contends here, as it did below, that its interest in preserving life outweighs the parents' assertion of their child's right of privacy to require removal of the life support system. The state also challenges the trial court's finding that Andrew is terminally ill and argues that the *370 court erred in basing its order on the doctrine of substituted judgment in the absence of evidence of the infant's intention.
While we agree that the state has a definite interest in preserving life, we must balance that right against the rights of an individual. For example, in January 1980 the Supreme Court of Florida held that a constitutional right of privacy affords a competent adult suffering from a terminal illness the right to refuse or order discontinued extraordinary medical treatments where all affected family members consent. While characterizing the issue as being more suitable to being addressed in the legislative forum, the court recognized that absent a response by the legislature, courts must proceed on a case-by-case basis to meet this type of problem. Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980).
While the court's observation in Perlmutter did not evoke any specific legislative response, the electors of this state, on November 4, 1980, adopted Article I, section 23, of the Bill of Rights to the Florida Constitution. That section provides an express right of privacy for every natural person and makes no distinction as to whether a natural person is competent to exercise that right. However, we agree with the Fourth District Court of Appeal which recently observed that the constitutional right of privacy would be an empty right if one who is incompetent were not granted the right of a competent counterpart to exercise his rights.[3]
The record refutes the state's contention that Andrew is not terminally ill and fully supports the trial judge's findings that the child is in a permanent vegetative coma without any cognitive brain function, that his condition is permanent and irreversible, and that his life is being sustained only through the use of extraordinary life prolonging measures.
Dr. Richard Inwood, a neonatologist, explained that Andrew was the second of twins. The first was stillborn, and Andrew, who arrived shortly thereafter, was asphyxiated with very little spontaneous activity. He developed seizures and problems of breathing soon after birth and was placed on a ventilator. Attempts to wean him from that have been unsuccessful. Dr. Inwood pointed to the CAT scan and sonograms which confirm his diagnosis of hypoxic eschemic encephalopathy of marked degree with overwhelming destruction of the child's brain tissue. In layman's terms, Dr. Inwood said there is basically a hole where a large part of the child's brain would normally be. Furthermore, he said the condition was incurable and irreversible, and he characterized the life support system as merely postponing the moment of the child's death. Dr. Kenneth Solomon, another neonatologist, and Dr. J. Richard Gunderman, a child neurologist, concurred in Dr. Inwood's diagnosis and prognosis. Dr. Gunderman added that, while Andrew was not dead by the definition of brain death per se, that medically speaking he has no life.
Each doctor was sensitive to the ethical and moral problems of discontinuing the respirator, but given the assurance that there would be no legal ramifications of a civil or criminal nature, each would abide by the decision of the parents which they regarded as correct. If the life support system were removed, it was their consensus that the child would die within an hour. If Andrew were to remain on the ventilator, they estimated he would continue to live anywhere from one to five years.
As noted, the state also argues that the court erred in basing its order on the doctrine of substituted judgment in the absence of evidence of Andrew's intent. The doctrine of "substituted judgment" was developed by the courts to afford incompetent patients the same rights as competent ones in determining whether medical treatment which merely prolongs the time of their death should be discontinued. Under this doctrine the court substitutes its *371 judgment for what it finds the patient, if competent, would have done. The doctrine has been helpful in the case of adults, but it is difficult to apply to children or young adults. The widely quoted case of In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976), concerned Karen Quinlan, a twenty-one-year old comatose woman being kept alive by life support systems. There, the court heard evidence of Karen's previous conversations with friends on questions concerning prolongation of life by artificial means. The court, however, found such views inconclusive and concluded that the only practical way of permitting Karen to exercise her right of privacy was to permit her family to exercise its best judgment as to what she would want done under the circumstances.
As the trial court noted in the present case, it is proper for the court to exercise its substituted judgment even absent evidence of intention of the incompetent person. However, in the case of a child who has not reached maturity, it is the parents and their medical advisors who generally must make these decisions. And, where judicial intervention becomes necessary or desirable, the court must be guided primarily by the judgment of the parents who are responsible for their child's well-being, provided, of course, that their judgment is supported by competent medical evidence.
Here, the parents testified that they had been adequately informed by their physicians as to their child's condition. Further, as members of the Catholic Church, they discussed the situation with several priests and determined their position was a moral one, and one supported by their church. This view was echoed by one of the physicians of their own faith who testified. They also noted their decision was not motivated by any financial strain because one hundred percent of all the medical expenses were being covered by their insurance.
Where, as here, the parents' informed decision is backed by uncontroverted medical evidence that their young child is terminally ill and that his condition is incurable and irreversible, their decision, we think, overrides any interest of the state in prolonging their child's life through extraordinary measures. We can conceive of no state interest great enough to compel the parents to continue to submit their child to a life support system in this instance. To do so would merely prolong the death of a child terminally ill, wholly lacking in cognitive brain functioning, completely unaware of his surroundings, and with no hope of development of any awareness. The means now being employed are measures which even the physicians testified they would not now initiate given their present knowledge of the situation. It is, we think, the right and obligation of the parents in such an instance to exercise their responsibility and prerogative, as did Mr. and Mrs. Barry, of making an informed determination as to whether these extraordinary measures should be continued. See In re Quinlan.
The record discloses that the proceedings below were thorough and handled with great care and concern. We conclude that there is clear and convincing evidence to support the trial judge's findings. Moreover, we affirm his conclusion that the interests of Andrew outweigh those of the state in this instance, and that his parents could validly assert a privacy interest on his behalf. We also agree that the trial court correctly applied the doctrine of substituted judgment. Therefore, we affirm the trial court in all respects.
Finally, while the issue is not squarely before us, the state has requested that we require judicial review before life support can be withheld from a non brain-dead child. We decline to so hold as we recognize that decisions of this character have traditionally been made within the privacy of the family relationship based on competent medical advice and consultation by the family with their religious advisors, if that be their persuasion.
As noted, the increased availability of advanced technology to artificially sustain *372 life through extraordinary measures has caused the medical community to look very closely at their ethical and legal responsibilities. Furthermore, lack of legislation and controlling judicial precedent and the omnipresent threat of malpractice litigation causes the medical community to proceed with great caution in acting on parental direction absent court approval. Nevertheless, where, as here, the question concerns a young child, we do not think the parents must always qualify as legal guardians and seek judicial sanctions to discontinue these extraordinary measures. A decision by parents supported by competent medical advice that their young child suffers from a permanent, incurable and irreversible physical or mental defect likely to soon result in the child's death should ordinarily be sufficient without court approval.[4] Of course, diagnosis should always be confirmed by at least two physicians. We must remember that the conscience of society in these matters is not something relegated to the exclusive jurisdiction of the court.
Although judicial intervention need not be solicited as a matter of course, still the courts must always be open to hear these matters on request of the family, guardian, affected medical personnel, or the state. In cases where doubt exists, or there is a lack of concurrence among the family, physicians, and the hospital, or if an affected party simply desires a judicial order, then the court must be available to consider the matter. Medical personnel and hospitals may well consider the suggestion made by Dr. Solomon in his testimony that an advisory committee should be available to assist families and physicians in these matters.[5] When called upon to resolve a controversy as to whether it is appropriate to remove a life support system from a comatose child or to sanction the judgment of affected parties, the court must be satisfied from clear and convincing evidence that the child suffers from an irreversible physical or mental defect, and there is no reasonable medical probability of the infant gaining a cognitive sapient state. When dealing with these problems, courts will, of necessity, have to apply the doctrine of substituted judgment.
Finally, we urge the trial courts to handle these matters on an expedited basis with due concern for the delicacy of the issues and the feelings of the parties involved.
AFFIRMED.
GRIMES, A.C.J., and LEHAN, J., concur.
NOTES
[1] For legal and medical purposes, where respiratory and circulatory functions are maintained by artificial means of support so as to preclude a determination that these functions have ceased, the occurrence of death may be determined where there is the irreversible cessation of the functioning of the entire brain, including the brain stem, determined in accordance with this section.
(2) Determination of death pursuant to this section shall be made in accordance with currently accepted reasonable medical standards by two physicians licensed under chapter 458 or chapter 459. One physician shall be the treating physician, and the other physician shall be a board-eligible or board-certified neurologist, neurosurgeon, internist, pediatrician, surgeon, or anesthesiologist.
(3) The next of kir of the patient shall be notified as soon as practicable of the procedures to determine death under this section. The medical records shall reflect such notice; if such notice has not been given, the medical records shall reflect the attempts to identify and notify the next of kin.
(4) No recovery shall be allowed nor shall criminal proceedings be instituted in any court in this state against a physician or licensed medical facility that makes a determination of death in accordance with this section or which acts in reliance thereon, if such determination is made in accordance with the accepted standard of care for such physician or facility set forth in s. 768.45. Except for a diagnosis of brain death, the standard set forth in this section is not the exclusive standard for determining death or for the withdrawal of life-support systems.
[2] Ark.Stat.Ann. § 82-3801.
[3] John F. Kennedy Memorial Hospital, Inc. v. Bludworth, 432 So.2d 611 (Fla. 4th DCA 1983) (wife acted on behalf of comatose husband pursuant to his prior direction in a "living will").
[4] Of course, all medical and hospital personnel will have to abide by any state or federal regulations in this area.
[5] This concept was suggested in 1975 by the court in In re Quinlan. The New Jersey court there referred to Teeler, The Physician's Dilemma: A Doctor's View: What the Law Should Be, 27 Baylor L.Rev. 6 (1975). Dr. Teeler discusses how an ethics committee could provide for dialogue in individual situations and for shared responsibility in making necessary decisions.