ALTENBERND, Judge.
Mrs. Browning’s guardian appeals the order of the trial court denying her petition to terminate artificial life support. This case requires us to determine whether the guardian of a patient who is incompetent but not in a permanent vegetative state, and who suffers from an incurable, but not necessarily terminal condition, may exercise the patient’s right of self-determination to forego sustenance provided artificially by a nasogastric tube.
We hold that the guardian is entitled to make this decision as a surrogate decision-maker [1] for the patient under article I, section 23, Florida Constitution. In this opinion, we establish a framework in which the surrogate decisionmaker is required to make this decision based upon adequate, up-to-date evidence on four issues. The surrogate decisionmaker’s function is to make the decision which clear and convincing evidence establishes that the patient, if competent, would make. If the surrogate decisionmaker has reasonable doubt, he or she must make a decision which supports life. Because this remedy is based upon a constitutional right of privacy, we anticipate that the decision typically will be made outside the judicial forum. The courts, however, remain open to act as decisionmaker in appropriate cases and to review the surrogate’s decision in cases of doubt.
The trial court denied the petition exclusively on a statutory basis. It found that Mrs. Browning’s death was not imminent so long as she received food and hydration. The trial court correctly ruled that a remedy for the guardian did not exist under the “Life-Prolonging Procedures Act of Florida,” sections 765.01-.15, Florida Statutes (1987). We affirm the trial court’s decision without prejudice to the guardian’s right to seek relief under the Florida Constitution.
I. THE. EVIDENCE PRESENTED TO THE TRIAL COURT
Mrs. Browning is eighty-nine years old. Her only child died when he was eighteen. Her husband died in 1978. Her only close living relative is a second cousin, Doris Herbert. Mrs. Herbert is eighty years old. She has known Mrs. Browning well for her entire life and lived with Mrs. Browning from 1982 until 1986.
In the decade preceding November 1986, Mrs. Browning experienced generally good health. She was happy, healthy, and enjoyed life. Dr. Lois West was her family physician. The only medical condition for which she received any significant treatment was hypertension.
On November 9, 1986, Mrs. Browning suffered a massive stroke. This cerebral vascular accident involved a large hemorrhage in the left parietal region of her brain. Although Mrs. Browning received extensive emergency treatment at Mease Hospital, the damage to her brain was clearly major, permanent, and irreversible. Hospital records from the time shortly after the stroke reflect that Mrs. Browning was totally unresponsive except that she would respond to deep pain by moving. Because she was unable to swallow, a gas-trostomy was performed on November 20, 1986. This procedure allows food and liquid to be introduced directly to the stomach through an opening in the abdominal wall.
On November 21, 1986, Mrs. Browning was transferred to Sunset Point Nursing Center. Following this transfer, Dr. Lois West ceased treating Mrs. Browning on a regular basis and Dr. James Avery became her primary treating physician. In the months that followed, Mrs. Browning’s medical records reflect frequent problems with nausea, bed sores, and other unpleasant, chronic maladies. None of these conditions would appear to be life-threatening. Due to Mrs. Browning’s brain damage, it is unclear whether she is aware of these con *262 ditions or suffers any cognitive pain. In May 1988, the gastrostomy tube became dislodged. Since that time, Mrs. Browning has been fed through a nasogastric tube.
A few months after Mrs. Browning’s stroke, Mrs. Herbert was appointed as legal guardian. The inventory of the guardian reflects that Mrs. Browning could remain at the nursing home for a substantial period without exhausting the assets of the guardianship.
On September 2, 1988, nearly two years after Mrs. Browning’s stroke, her guardian filed a petition to terminate artificial life support. The petition was based primarily upon a living will executed by Mrs. Browning on November 19, 1985. Although the petition refers to Mrs. Browning’s right to remove the feeding tube under the United States Constitution and the Florida Constitution, this case was presented to the trial court almost exclusively under chapter 765, Florida Statutes (1987). It is apparent that the guardian’s attorney and the trial court were confused concerning the distinction between the procedures required for chapter 765 and for a constitutional petition. See John F. Kennedy Memorial Hosp. v. Bludworth, 452 So.2d 921 (Fla.1984). Since the appellate courts of this state have not clearly enunciated the procedures, this confusion is understandable.
The trial court conducted an evidentiary hearing on the petition to terminate. The evidence at the hearing concerned two issues — Mrs. Browning’s desire to terminate food and hydration and the nature of her current medical condition.
Concerning Mrs. Browning’s desire to terminate food and hydration, the guardian relied primarily upon Mrs. Browning’s living will. An accurate copy of the living will executed by Mrs. Browning on November 19, 1985, is attached as an appendix to this opinion. The guardian placed heavy emphasis upon the sentence in the living will in which Mrs. Browning, by her “x” in a box, had indicated her desire that “nutrition and hydration (food and water)” not be provided. This language is not the standard language suggested by the legislature in section 765.05(1), Florida Statutes (1987). The statute, however, provides that “other specific directions” may be included within a living will. § 765.05(2), Fla.Stat. (1987). In Mrs. Browning’s will, however, the sentence concerning food and water immediately follows and is within the same paragraph as the standard language authorizing the withdrawal of life-sustaining procedures when “my death is imminent.” The state argues that Mrs. Browning’s death is not imminent, and thus, no remedy should exist.
In addition to the living will, the court heard evidence from the guardian and from two of Mrs. Browning’s neighbors. Mrs. Browning had told them, after a visit to someone in a nursing home, that she never wished to be in such a condition and that she was thankful that her living will had taken care of this problem. Mrs. Browning had signed a prior living will and had executed the newer will to be certain that the will was enforceable. Prior to her stroke, Mrs. Browning had also provided a copy of her living will to Dr. West.
The religious or ethical beliefs of a patient can play a significant role in proceedings such as we have for review today. Public Health Trust v. Wons, 541 So.2d 96 (Fla.1989).[2] The evidence presented to the trial court did not include evidence of any religious beliefs supporting or prohibiting the removal of the nasogastric tube.
Concerning Mrs. Browning’s medical condition, the evidence is also limited and troubling for this court. Mrs. Browning’s primary treating physician, Dr. Avery, did not testify at the hearing. No certificate from Dr. Avery concerning Mrs. Browning’s *263 medical condition was introduced into evidence. Instead, the guardian introduced a one-paragraph letter from Dr. Avery, which was prepared eight months before the September 1988 hearing. In the letter, Dr. Avery states:
Mrs. Browning has been in a stable but poor condition over the last few months. She has not been able to feed, care or do any activities and is totally bedridden. Her mental status is poor and she dose [sic] not respond to verbal stimuli at all. She dose [sic] respond with primitive movements to tactile or painful stimuli. She does not appear to interact with her environment apart from the above. Her physical condition is stable and her large decubitus ulcer has remained stable because of good nursing care.
The guardian also introduced a letter from Dr. Edward Hayward dated April 11, 1988. That letter states in part:
Her condition has not substantially changed since I have been visiting her at Sunset Point, reflecting the good care she is receiving. She is, however, alert and follows people around the room with her eyes. She looks at you when you attempt to talk to her. She appears to understand but does not follow simple orders.
In summary, Estelle Browning is a very unfortunate female who appears to be medically stable with total supportive care but whose chance for a meaningful recovery is very small.
Dr. West testified at the hearing. After Mrs. Browning had been discharged from Meese Hospital, Dr. West had seen Mrs. Browning on only two occasions in March and September of 1988. In March, Mrs. Browning’s eyes would follow the doctor around the room. She attempted to speak or make sounds, but could not be understood. In a letter prepared on March 28, 1988, Dr. West stated:
Clearly Mrs. Browning is not comatose or brain dead. However, her existence and quality of life is minimal. It is of interest that Mrs. Browning in her living will did specifically state that she did not want to be kept alive by intravenous or gastric feedings. Mrs. Browning would expire if the gastric tube feedings were discontinued. Because Mrs. Browning is now able to open her eyes and make noises, it is very difficult for physicians and staff to deprive this lady of nutrition. Becuse [sic] of her specific request, however, perhaps her case should be presented before the courts.
Finally, the guardian presented the deposition testimony of a board-certified neurologist. He examined Mrs. Browning for approximately twenty minutes on September 25, 1988. He observed that Mrs. Browning would moan and blink her eyes. In the opinion of the neurologist, Mrs. Browning was in a persistent vegetative state, with little or no neurological activity above the brain stem. He admitted, however, that if Mrs. Browning attempted to speak, rather than simply make noise, that would indicate some degree of cognizance.[3]
Sunset Point opposed the petition. The nursing home presented evidence from a registered nurse who had spent thirty to forty-five minutes a day with Mrs. Browning for eighteen months preceding the hearing. Although the words had not been clear, the nurse believed that Mrs. Browning had said “hello,” “hi,” “bye,” and “don’t do that” on a few occasions. She testified that Mrs. Browning had said “hi” on the day before the hearing.
At the conclusion of the evidence, the trial court entered an order denying the petition to terminate. The trial court deter *264 mined that Mrs. Browning’s death was not “imminent” so long as she received sustenance. Although the trial court found that Mrs. Browning would die within four to nine days upon the withdrawal of the nasogastric tube, the trial court ruled that the imminence of Mrs. Browning’s death under chapter 765 must be measured under conditions in which sustenance is provided. The guardian did not specifically request the trial court to provide a constitutional remedy and the lower court made no ruling upon that subject. The petition was denied without prejudice to a renewed petition should Mrs. Browning’s conditions change.
II. NO REMEDY IS PROVIDED THE GUARDIAN UNDER CHAPTER 765
Chapter 765, Florida Statutes (1987), creates a statutory right to decline life-prolonging procedures. The act was first created in 1984 and has not been extensively interpreted by the courts.[4] Section 765.04(1) creates the applicable statutory right:
Any competent adult may, at any time, make a written declaration directing the withholding or withdrawal of life-prolonging procedures in the event such person should have a terminal condition. (Emphasis supplied.)
In this case, there is no question that Mrs. Browning, as a competent adult, made a written declaration or a living will. The statutory issues presented by this case are whether the nasogastric tube is a “life-prolonging procedure” which may be withdrawn under the act, and whether Mrs. Browning was suffering from a “terminal condition” at the time of the hearing on her petition. Although these issues are interrelated, a negative answer to either question would support the trial court’s denial of the petition. In this case, both questions must be answered in the negative.
The statute defines “life-prolonging procedure” as:
[A]ny medical procedure, treatment, or intervention which:
(a) Utilizes mechanical or other artificial means to sustain, restore, or supplant a spontaneous vital function; and
(b) When applied to a patient in a terminal condition, serves only to prolong the process of dying.
The term “life-prolonging procedure” does not include the provision of sustenance or the administration of medication or performance of any medical procedure deemed necessary to provide comfort care or to alleviate pain.
§ 765.03(3), Fla.Stat. (1987).
This court has previously determined that a nasogastric tube is a medical procedure utilized to sustain spontaneous vital functions. Corbett v. D’Alessandro, 487 So.2d 368 (Fla. 2d DCA), review denied, 492 So. 2d 1331 (1986). In Corbett, however, we agreed with the trial court that an artificial feeding device involved the “provision of sustenance” and, thus, was not a life-prolonging procedure for purposes of the statute. Id. at 370. While we authorized the discontinuance of a nasogastric tube in the Corbett decision, this court made that decision under the constitutional right rather than under the statutory right.
The guardian asks this court to recede from the decision in Corbett. She argues that the phrase “to provide comfort care or to alleviate pain” in section 765.03(3), Florida Statutes (1987), modifies not only the phrase “any medical procedure,” but also the earlier phrases in that sentence. We rejected that analysis in Corbett and we reject it today. If anything, we are more confident today that our decision correctly interprets the legislature’s intent. Following the Corbett decision, bills to overrule the Corbett interpretation were introduced in both The Florida Senate and the Florida House of Representatives. Fla.S.B. 898 (1987); Fla.H.B. 1387 (1987); Fla.H.B. 670 (1986). The proposed legislation was unsuccessful. See Morgan, Florida Law and *265 Feeding Tubes — The Right of Removal, 17 Section L.Rev. 109, 134 (1988).
The guardian further argues that Mrs. Browning has a “terminal condition” because her death is imminent if the nasogas-tric tube is removed. The statute defines “terminal condition” as:
[A] condition caused by injury, disease, or illness from which, to a reasonable degree of medical certainty, there can be no recovery and which makes death imminent.
§ 765.03(6), Fla.Stat. (1987). The medical evidence in this case indicates that Mrs. Browning could live a substantial period of time with the nasogastric tube but would die within a few days upon its withdrawal. The term “imminent” is not defined within the statute.[5] Without defining the outer range of “imminent,” we assume for purposes of argument that Mrs. Browning’s death without the aid of a nasogastric tube would be imminent.
The definition of “terminal condition” in section 765.03(6) does not clearly indicate the conditions under which one must analyze the imminence of death. Three options are available: (1) death occurring with the continuation of all medical treatment; (2) death occurring without statutory life-prolonging procedures; and (3) death occurring without any care other than comfort care. While other states do have statutes which define imminent death under conditions where all medical treatment is continued, such a definition effectively renders the statute useless.[6] If death is truly imminent even with the continuation of life-prolonging procedures, there is no need to create a judicial or quasi-judicial procedure for their withdrawal. In most cases, death would occur before the decision to withdraw life-prolonging procedures could take place.
The third option presents the opposite extreme. If a condition is terminal when food and water are withdrawn from the human body, any condition is “terminal” because almost any human would die within a few days if food and water were withdrawn. Thus, the only reasonable alternative is to determine whether a disease would be terminal in the absence of statutory life-prolonging procedures. For example, a patient on a respirator has a terminal condition if that person would die within a few days after removal of the respirator. See In re Guardianship of Barry, 445 So.2d 365 (Fla. 2d DCA 1984).
Because Mrs. Browning’s condition is not a “terminal” condition for purposes of chapter 765, and because the nasogastric tube is not a statutory life-prolonging procedure, we can provide no remedy to Mrs. Browning under the statute.[7] The statute, however, is cumulative to Mrs. Browning’s existing rights. § 765.15, Fla.Stat. (1987). As we did in Corbett, we must determine whether this patient has any existing rights by statute, common law, or constitution which would authorize the remedy requested in this case. Corbett, 487 So.2d at 370.
III. NO OTHER FLORIDA STATUTE PROVIDES A REMEDY
The guardian has not cited any other statutory basis which would authorize the removal of the nasogastric tube in this case. This court’s independent search has located no other statutory remedy.[8] Because Mrs. Browning’s living will contains *266 some nonstandard language, however, we comment briefly and purely as dicta, upon a procedure which the bar should consider in future cases.
Mrs. Browning’s declaration designated her family physician as her “agent for the purpose of making medical treatment decisions.” Section 765.05(2), Florida Statutes (1987), permits this type of “specific” direction, but provides little guidance concerning the language required or the procedures to be utilized to create a valid medical power of attorney. It does not appear that Dr. West has ever agreed to serve ⅛ this capacity in this case. No one has attempted to enforce this provision in this case.
Generally, powers of attorney do not survive incompetency. See Millman v. First Fed. Sav. & Loan Ass’n, 198 So.2d 338 (Fla. 4th DCA 1967). A durable power of attorney can be created in Florida if the person designated to act is a family member. § 709.08, Fla.Stat. (Supp.1988). The statute authorizing a durable power of attorney does not expressly refer to medical treatment decisions.[9] By combining the written declaration suggested in section 765.05, Florida Statutes (1987), with a durable family power of attorney under section 709.08, Florida Statutes (Supp.1988), it is possible that a surrogate decisionmaker could be established who had detailed information concerning the desires of the patient. Such a decisionmaker could be better prepared to make a decision based upon clear and convincing evidence.[10]
IV. THE RIGHT TO REFUSE MEDICAL TREATMENT
As in Corbett, we find that a remedy must exist to fulfill Mrs. Browning’s constitutional right of privacy. In order to determine the nature of the remedy available for Mrs. Browning, however, it is important to understand the right upon which the remedy is premised. Many states have recognized that competent adult patients have a right to forego a wide array of medical treatment. Wons; Satz v. Perlmutter, 362 So.2d 160 (Fla. 4th DCA 1978), approved, 379 So.2d 359 (1980); Rasmussen v. Fleming, 154 Ariz. 207, 741 P.2d 674 (1987); Bouvia v. Superior Court, 179 Cal.App.3d 1127, 225 Cal.Rptr. 297 (1986). This right includes the right to reject life-prolonging or life-sustaining procedures. The state, however, has the ability to override the individual’s self-determination if the individual's decision is outweighed by various state interests. Typically, the state interests include:
(1) preservation of life;
(2) the protection of third parties;
(3) the duty to prevent suicide; and
(4) the maintenance of ethical integrity within the medical practice.
These factors are discussed in Superintendent of Belchertown v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977). They have been adopted for use in Florida. Satz; Wons. The trial court should not regard these factors as exclusive.[11] A refinement of these factors could only improve this state’s analysis of this difficult problem.
The foundation of this right to refuse medical treatment is based upon the individual’s right of self-determination. Some cases have found this right within the common law. In re Conroy, 98 N.J. 321, 486 *267 A.2d 1209, 1223 (1985); In re Storar, 52 N.Y.2d 363, 376-77, 420 N.E.2d 64, 70, 438 N.Y.S.2d 266, 272-73, cert. denied, 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981). See also L. Tribe, American Constitutional Law § 15-11 (2d ed. 1988). Other decisions have relied upon the shadowy penumbra of the United States Constitution. In re Quinlan, 70 N.J. 10, 355 A.2d 647, cert. denied, sub nom. Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); see also In re Farrell, 108 N.J. 335, 529 A.2d 404 (1987).
In Florida, however, the right of privacy is specifically guaranteed by article I, section 23, Florida Constitution.[12] This constitutional right of privacy was affirmatively created by a vote of the people in 1980. It is clear that Floridians have “a strong right of privacy not found in the United States Constitution” and that this right is “much broader in scope than that of the Federal Constitution.” Winfield v. Div. of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla.1985); see also Wons. A similar state constitutional provision supported a patient’s right to remove a nasogastric tube in Arizona. Rasmussen. A recent Missouri decision which prohibited the removal of a gastrostomy tube is distinguishable because that state relied upon the absence of a state right of privacy to reach its result. Cruzan v. Harmon, 760 S.W.2d 408 (Mo.1988).
It is now established that an incompetent adult patient has the same constitutional right to refuse medical treatment as a competent patient. Bludworth; Corbett. In Bludworth and Corbett, the patients either had a terminal illness or were in a permanent vegetative state. A person’s constitutional right of privacy, however, is not lost when the person’s mental or physical status changes. As the New Jersey Supreme Court observed:
All patients, competent or incompetent, with some limited cognitive ability or in a persistent vegetative state, terminally ill or not terminally ill, are entitled to choose whether or not they want life-sustaining medical treatment.
In re Peter, 108 N.J. 365, 529 A.2d 419, 423 (1987); see also In re Guardianship of Grant, 109 Wash.2d 545, 747 P.2d 445 (1987); In re Westchester County Medical Center, 72 N.Y.2d 517, 534 N.Y.S.2d 886, 531 N.E.2d 607 (1988). When a person is no longer competent to exercise his or her own right of self-determination, the right still exists, but the decision must be delegated to a surrogate decisionmaker. This delegation requires thoughtful guidelines to assure that the decision fulfills the patient’s right of self-determination rather than some other interest.
V. IMPORTANT FACTORS TO CONSIDER IN FASHIONING A REMEDY TO PROTECT THIS RIGHT OF PRIVACY
As legal analysis of a problem evolves under the case law system, at least two distinctly different methodologies may occur. Frequently, a problem can be divided into categories and a solution provided for each category. In the alternative, it is sometimes better to analyze the problem as a cluster of competing interests which must be balanced. This court has previously announced a procedure allowing parents to exercise their infant’s right of self-determination in cases where the infant suffers from an incurable, terminal condition. In re Barry.[13] This state has announced a similar procedure for competent adults with a terminal illness. Satz. Recently, the procedure for competent adults has been extended to nonterminal illness in cases affected by freedom of religion. *268 Wons. A procedure allowing a legal guardian or a close family member to exercise the patient's right has been created by the Supreme Court of Florida for adults in a permanent vegetative state. Bludworth. This court has ruled that the Bludworth procedure is available even to remove artificial feeding devices. Corbett.[14] At least one state seems inclined to create a cluster of differing procedures applicable to separate categories established by the patient’s mental and physical condition.[15] We believe that a more workable solution can be established by balancing the various factors that influence a decision to withhold life-sustaining medical treatment. A balancing test avoids fine distinctions in diagnosis and definition which are frequently indefensible. It also allows the courts to recognize the complexity of the human condition, and medical, ethical, and technological advances which will surely occur in the future.
For example, in evaluating a patient’s physical condition, there clearly exists a continuum of conditions between a totally healthy human body and a body upon the brink of death. Predicting that a condition is “terminal” within any specific time, period or opining on the “imminence” of death has been very difficult for the medical profession. President’s Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment at 24-27 (1983), a report on the ethical, medical, and legal issues in treatment decisions (hereinafter cited as President’s Commission Report). Distinguishing between serious illnesses, life-threatening conditions, and terminal illnesses is frequently difficult for physicians and nearly impossible for the legal community. By utilizing a balancing test, we do not force physicians to make fine distinctions in areas where diagnosis can be difficult. Rather than forcing the physician to fit the patient’s condition within a legal definition of a medical condition, we would allow the physician the opportunity to provide a more complete and descriptive analysis of the patient’s physical condition.
Likewise, the lines separating competence, incompetence, permanent vegetative state, and coma are frequently difficult. In this case, the evidence is inconclusive concerning whether Mrs. Browning is in a permanent vegetative state. See also In re Jobes, 108 N.J. 394, 529 A.2d 434 (1987). At one extreme of the continuum, a coma or a permanent vegetative state may itself be a condition which authorizes the discontinuance of life-sustaining treatment. In re Quinlan; In re Barry. Other degrees of mental limitation may not justify the removal of life-sustaining treatment, but rather may merely be a factor requiring a decision by a surrogate. Saikewicz. Again, it is preferable to allow physicians the flexibility to fully describe a patient’s mental status rather than to pressure them into a diagnostic opinion which either permits or prohibits a surrogate’s decision. Especially in light of the rapid advance of medical technology, it seems more appropriate for this state to create a balancing test which the surrogate decisionmaker can utilize in all cases of adult incompetency, without regard to the patient’s precise prognosis or mental status.
In fashioning the remedy, Several additional factors should be considered. First, the remedy exists to fulfill a right of privacy. Thus, the procedures to invoke and enforce this right should be as private *269 as the state’s competing interests can permit for such a delicate decision. We obviously do a poor job of protecting Mrs. Browning’s right of privacy by discussing the details of her medical condition and the nature of her family structure in a highly publicized decision which will be preserved for posterity. For the Floridians who follow Mrs. Browning, we hope to create a more private decisionmaking process.
Second, the decisionmaking process should involve all the necessary participants. Ultimately, only one surrogate makes the decision. It is important, however, that the decisionmaker receive advice from family members, physicians, friends, and other persons whose information can increase the probability that a correct decision is made.[16]
Third, it is important that the decision be prompt. The list of cases in which courts “grant” a right of privacy only after the patient has expired, grows longer every day. See In re Farrell, 529 A.2d at 407.
Fourth, it is important for the surrogate decisionmaker to fully appreciate that he or she makes the decision which the patient would personally choose. In this state, we have adopted a concept of “substituted judgment.” In re Barry. One does not exercise another’s right of self-determination or fulfill that person’s right of privacy by making a decision which the state, the family, or public opinion would prefer. The surrogate decisionmaker must he confident that he or she can and is voicing the patient’s decision.
The Ethics and Advocacy Task Force, as amicus curiae, raises a very legitimate concern that the “right to die” could become a license to kill. There are times when some people believe that another would be “better off dead” even though the other person is still fighting vigorously to live. Euthanasia is a crime in this state. § 782.08, Fla.Stat. (1987). See § 765.11(1), Fla.Stat. (1987). Despite the tremendous advances achieved in this century, the world has witnessed the extermination of retarded and mentally disturbed persons for whom a foreign government decided that death was the proper prescription. Thus, it cannot be overemphasized that the remedy announced in this opinion and the procedures designed to safeguard that remedy are based upon the patient’s right to make a personal and private decision and not upon other interests.
Fifth, the surrogate decisionmaker must fully appreciate the importance of the state’s interest. While our reported decisions have allowed an individual’s right of privacy to outweigh the state’s interest on several occasions in Satz, In re Barry, Bludworth, Corbett, and Worn, there should be no confusion that the state’s interests are in fact real and substantial. In the Florida cases reported to date, the patients were either suffering from a disease which was clearly terminal, Satz and In re Barry; they were suffering from permanent vegetative states in which it was obvious they would never again become aware of their environment, Corbett, In re Barry, and Bludworth; or, their right of religious freedom was an overriding factor. Wons. Especially in cases involving terminal illness or a permanent vegetative state, the issue is almost quantitative rather than qualitative. The medical treatment given to a terminal patient is frequently regarded as death-prolonging and measured by brief periods of time. In cases of a coma or permanent vegetative state, there is a sense that life has lost all quality.
In the case of Mrs. Browning, we step onto different terrain involving the quality of life. Some would surely describe this territory as a “slippery slope.” In re Grant, 747 P.2d at 458 (Anderson, J., dissenting). We are not, however, the first court to enter this region. Saikewicz; Brophy v. New England Sinai Hosp., Inc., 398 Mass. 417, 497 N.E.2d 626 (1986); In re Jobes; In re Conroy; In re Westchester County Medical Center. In this case, the *270 patient is very old; but, as we earlier noted, she is not suffering from a terminal illness. Her vegetative state may not be complete. This is a case in which the patient wishes to discontinue medical treatment because the quality of her life is so poor that she prefers the death which would naturally occur in the absence of the artificial feeding. While there clearly are cases in which a patient may elect to fore-go life-sustaining medical care in a “quality of life” situation, we believe that the factors described in Satz weigh far greater in the balance of such cases. In such cases, the state’s interest in life increases sharply. In such cases, the act intuitively seems closer to suicide.[17] The ethics of the medical community become a concern warranting careful consideration. It is obvious that the treating nurse in this case finds the guardian’s proposal to be unethical. While the state cannot allow the ethics of physicians or nurses to override the constitutional rights of patients, they are a legitimate concern which should not be lightly disregarded.[18]
Finally, we would comment that the remedy we create is limited because we are a court and not a legislature, and because we are addressing a constitutional right of privacy rather than other considerations. The legislature could clearly enact a more sophisticated remedy or create procedures based upon interests in addition to the patient’s constitutional right of privacy.
VI. SELECTING THE SURROGATE DECISIONMAKER
In this case, Doris Herbert is the legal guardian of Mrs. Browning. A legal guardian may exercise the patient’s right to forego medical treatment. Bludworth. In Bludworth, the supreme court held that either a legal guardian or a close family member could make this decision for a patient in essentially a vegetative state. We are not holding that a legal guardian must always be appointed to make life-sustaining medical decisions.[19] While a legal guardian is not essential in all cases, it is comforting that such a guardian exists in this case. A guardian who is appointed by a court and who has taken an oath pursuant to chapter 744, is more likely to give the responsibility the serious attention which it deserves. In this state, the appointment of a legal guardian for a severely ill individual is neither cumbersome nor overly time-consuming. Especially in difficult cases, we would urge the appointment of a legal guardian.
The circuit court should also be available to make the decision in the exceptional case. As this court stated in In re Barry:
Although judicial intervention need not be solicited as a matter of course, still the courts must always be open to hear these matters on request of the family, guardian, affected medical personnel, or the state. In cases where doubt exists or there is a lack of concurrence among the family, physicians, and the hospital, or if an affected party simply desires a judicial order, then the court must be available to consider the matter.
In re Barry, 445 So.2d at 372. Especially when the patient has no close family members and the guardian is essentially a stranger, the guardian might prefer to delegate this decision to the circuit court.
VII. ESTABLISHING A FORUM IN WHICH TO MAKE THE DECISION
In this case, by filing a petition in the circuit court, the guardian selected the *271 circuit court as the forum in which to make the decision.[20] While a circuit court is certainly an adequate forum in which to obtain evidence and make a studied decision, it is not a forum which always preserves a party’s right of privacy. Thus, we believe the guardian can typically make this decision outside the ciréuit court and without judicial review. See Bludworth.
Obviously, there is legitimate concern that an informal forum may encourage the surrogate decisionmaker to disregard important evidence or make decisions which are unduly influenced by persons with improper motives. On the other hand, the informal forum may encourage greater openness by doctors, nurses, and family members.[21] We are not convinced that the people of this state have abandoned their faith in the value and sanctity of life. Until we see evidence of some abuse by an informal forum, we believe that its advantages outweigh its disadvantages. This is particularly true in light of the evidentiary requirements and the burden of proof which this opinion places upon the surrogate decisionmaker.[22]
VIII. ESSENTIAL EVIDENCE FOR A DECISION TO FOREGO LIFE-SUSTAINING TREATMENT
Guardians and other family members regularly make medical decisions for patients on matters less critical than life-sustaining treatment. We do not intend by this opinion to preclude that practice or to require great formalities for those decisions. By “life-sustaining treatment,” we mean treatment, the withdrawal or withholding of which, would, within reasonable medical certainty, be a substantial contributing cause of the patient’s death within a relatively short period of time. We recognize that physicians and surrogate decisionmakers may face decisions in which it is unclear whether the treatment is life-sustaining. We believe that this concept can be further refined in future cases. It will change with advances in medical technology. There is no question, however, that respirators and artificial feeding devices are life-sustaining treatment.
When the surrogate decisionmaker decides to forego life-sustaining treatment, he or she must have adequate, up-to-date evidence on four issues:
(1) Is the patient suffering from a medical condition which would permit the patient, if competent, to forego life-sustaining medical treatment?
(2) Is there any reasonable probability that the patient will regain competency so that this right could be self-exercised by the patient?
(3) Is the patient’s personal decision on this subject sufficiently clear that the guardian can make a substituted judgment?
(4) Is the patient’s right to forego medical treatment outweighed by state interests under the Satz standards?
In making a determination of the patient’s current medical condition and competency, the surrogate decisionmaker must rely upon the available medical evidence, including certificates from the primary treating physician and two other physicians. The certificates should provide information including at least:
1. A summary of the patient’s current medical condition, including the level of mental and physical functioning.
*272 2. The degree of pain and discomfort experienced currently by the patient and expected by the physician in the future.
3. The nature of the medical treatment which is to be withheld or withdrawn, including its benefits, risks, invasiveness, painfulness, and side effects.
4. The prognosis of the patient with and without the medical assistance, including life expectancy, suffering, and the possibility of recovery.
5. Whether the physician believes it is appropriate within medical ethics to remove or withdraw the proposed treatment.[23]
By a certificate, we mean an affidavit, sworn statement, or deposition. These requirements appear consistent, albeit more extensive, than the certificate requirement in Bludworth. In Bludworth, a certificate that the patient was in a permanent vegetative state was clearly a certificate of a medical condition which would permit the patient, if competent, to withdraw medical treatment. Obviously, the eight-month-old letter utilized by the guardian in this case is totally insufficient to support such a serious decision.
Concerning the likelihood that the patient will regain competency, we are not requiring evidence of a permanent vegetative state. This element is not required to establish a medical condition justifying a withdrawal of medical treatment. Instead, it is required to determine the necessity for a surrogate to make the decision. If there is a reasonable probability that the patient will regain sufficient competency to assist in the decisionmaking process, the decision should be deferred.[24]
Concerning the desires and intentions of the patient, the surrogate decision-maker is attempting to obtain sufficient information so that the surrogate is confident that the surrogate decision is the decision the patient would make if he or she were competent. In a case such as this, where a living will was prepared by the patient, it should be accorded great weight in the final decision. It is not, however, the only evidence. It is possible that the patient has orally revoked the will. § 765.06(3), Fla.Stat. (1987). In addition to a living will, the surrogate decisionmaker may consider oral statements made by the patient while competent. The patient’s religious beliefs may influence the decision. The surrogate may also consider character evidence from close family members and friends which is relevant concerning the decision the patient would have made under these circumstances.
In this case, there is an ambiguity in the wording of the living will. The wording of the living will was clearly provided by a person other than Mrs. Browning. Especially when the language of the living will is prepared by a third party, parol evidence should be considered to understand the true intent of the patient.
We do not anticipate that the private forum typically chosen by a surrogate deci-sionmaker will exercise formal rules of evidence. We do expect the surrogate deci-sionmaker, however, to carefully consider all evidence which is relevant in reaching this decision.
In this state, the surrogate deci-sionmaker makes the decision under the doctrine of “substituted judgment.” Bludworth, 452 So.2d at 926; In re Barry, 445 So.2d at 370. We emphasize that this doctrine does not allow the guardian to truly substitute the guardian’s judgment for that of the patient. The guardian makes the decision which the evidence establishes the patient would have made under these circumstances. The guardian makes the decision which the patient would have made even if that decision is different than the *273 decision which the guardian would make for himself or herself.
In other states, courts have allowed the surrogate decisionmaker to make decisions not only based upon the subjective intent of the patient, but also upon “objective” or “best interests” standards. In re Conroy; Rasmussen, 741 P.2d at 688.[25] These states generally allow a guardian to make an objective decision based on factors other than the patient’s intentions when a decision cannot accurately be made under the substituted judgment standard.
We reject the objective or best interest approach because it is not a remedy to fulfill with a constitutional right of privacy. It is a test under which the surrogate deci-sionmaker seems to make the decision which a public referendum or a benign leader would reach.[26] We cannot afford to confuse the patient’s right of privacy with a public opinion poll. Thus, we restrict the guardian to a decision based only upon relevant evidence concerning the personal decision which the patient, if competent, would make.[27]
IX. A CLEAR AND CONVINCING BURDEN OF PROOF
This state has already determined that the surrogate decisionmaker can decide to forego life-sustaining treatment only on the basis of clear and convincing evidence. In re Barry, 445 So.2d at 372. Although we permit the guardian to make this decision in an informal forum, we emphasize that the decision must still be made upon clear and convincing evidence.
[C]lear and convincing evidence requires that the evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.
Slomowitz v. Walker, 429 So.2d 797, 800 (Fla. 4th DCA 1983). It is possible for the evidence in such a case to be clear and convincing, even though some evidence may be inconsistent. Likewise, it is possible for the evidence to be uncontroverted, and yet not be clear and convincing. In re Jobes, 529 A.2d at 441.
In making this difficult decision, a surrogate decisionmaker should err on the side of life. In this state, all natural persons not only possess a right of privacy, they also possess “the right to enjoy and defend life and liberty, to pursue happiness.... ” Art. I, § 2, Fla. Const. In cases of doubt, we must assume that a patient would choose to defend life in exercising his or her right of privacy.
X. THE SCOPE OF JUDICIAL REVIEW.
In cases where the surrogate makes the decision to forego medical treat *274 ment in an informal forum, our circuit courts should be open to review the decision. While judicial review'should often be unnecessary, if the family, a physician, the hospital, or any other affected party is in doubt as to the lawfulness of the decision, the circuit courts are empowered to determine its validity.
In reviewing the surrogate’s decisions on the first three issues — the severity of the medical condition, the competency of the patient, and the decision which the patient, if competent, would make — the circuit court should conduct a three-prong review. First, it should determine that the surrogate followed the applicable rules of law. Second, it should determine that the surrogate’s decision was based upon substantial, competent evidence. Helman v. Seaboard Coast Line R.R., 349 So.2d 1187 (Fla.1977). The trial court should not reweigh the evidence or substitute its judgment for that of the surrogate decisionmaker. If the trial court finds that these first two requirements have not been satisfied, the trial court should invalidate the decision without prejudice to the surrogate’s right to reconsider the decision under the applicable law and the appropriate evidence.
Third, the circuit court should review the surrogate’s decision to determine whether it was made in good faith. This review should determine whether the decision was made with honesty of intention and in an honest effort to make the decision which the patient, if competent, would make. It is possible, for example, that economic considerations, family pressures, or other factors of undue influence could cloud a surrogate’s judgment. If the trial court determines by the greater weight of the evidence that the surrogate’s decision was not made in good faith, then the trial court should disregard the surrogate’s decision and grant the surrogate an opportunity to present to the trial court by trial de novo all relevant evidence and testimony the surrogate may deem appropriate so that the trial court can resolve the first three issues — the severity of the medical condition, the competency of the patient, and the decision which the patient, if competent, would make — by clear and convincing evidence.
Concerning the fourth issue, the state’s interests, the circuit court should always conduct an independent review. As a representative of the state, the circuit court should be satisfied that the state’s interests do not outweigh the individual’s right of privacy. As described earlier, when the decision to forego life-sustaining medical treatment involves a patient who is neither terminally ill nor in a permanent vegetative state, the state’s interest should be most carefully analyzed. When necessary, the trial court should require additional evidence, including expert testimony, to protect the state’s interests.
A critic of this opinion might argue that we have provided broad guidelines in a case where a simple affirmance would suffice. It would have been easy in this case to simply remand the matter to the trial court for a constitutional hearing with no prescribed guidelines. The moral and legal complications of this case make such an approach tempting to an appellate court. On the other hand, we would not fulfill our constitutional responsibilities if we allowed Mrs. Browning to become yet another citizen who received her constitutional right of privacy posthumously. We do not envy the guardian her difficult task in this case and express no opinion as to the decision she should reach.
We hope this opinion will spark the serious and thorough debate in the legislature which these issues deserve. Because this decision expressly construes a provision of the state constitution and involves issues of great public importance, we certify the following question to the Florida Supreme Court:
WHETHER THE GUARDIAN OF A PATIENT WHO IS INCOMPETENT BUT NOT IN A PERMANENT VEGETATIVE STATE AND WHO SUFFERS FROM AN INCURABLE, BUT NOT TERMINAL CONDITION, MAY EXERCISE THE PATIENT’S RIGHT OF SELF-DETERMINATION TO FOREGO SUSTENANCE PROVIDED ARTIFICIALLY BY A NASOGASTRIC TUBE?
Affirmed without prejudice to a renewed petition. The guardian has requested that we accelerate motions for rehearing. Although this proceeding does not prevent the filing of a new petition, we do accelerate rehearing. Any motion for rehearing must be filed and hand delivered to the other parties on or before April 17, 1989. Any response must be filed on or before April 21, 1989.
RYDER, A.C.J., and PARKER, J., concur.
*275 APPENDIX
[[Image here]]
*276 ON MOTIONS FOR CLARIFICATION
ALTENBERND, Judge.
Both parties have filed motions for clarification. Those motions are denied, with the exception of the following two items.
In section VIII of the opinion, we require the surrogate decisionmaker to obtain medical certificates “from the primary treating physician and two other physicians.” The State correctly observes that the certificates should be from the primary treating physician and “at least two other physicians with specialities relevant to the patient's condition." John F. Kennedy Memorial Hosp. v. Bludworth, 452 So.2d 921, 926 (Fla.1984). Thus, we clarify the opinion to require the concurring physicians to have specialities relevant to the patient’s condition.
The guardian asks us to clarify the conditions under which the guardian or persons acting pursuant to her decision would be immune from civil or criminal liability. In Bludworth, the supreme court held that no civil or criminal liability would exist so long as the participants acted “in good faith.”
For them to be held civilly or criminally liable, there must be a showing that their actions were not in good faith but were intended to harm the patient.
Bludworth, 452 So.2d at 926. We do not intend to modify the supreme court’s ruling.
In section X of our own opinion, we have created a method to seek judicial review of the surrogate’s decision. The scope of review which we have created would allow the circuit court to overrule the surrogate’s decision to forgo medical treatment even though the surrogate’s decision might not impose civil or criminal liability under the Bludworth standard. In other words, we intended our scope of review to provide greater protection for the patient’s life and the state’s interests than the standard created in Bludworth to impose civil or criminal liability upon the surrogate decision-maker. Conversely, any decision by a surrogate which satisfied the scope of review created in our opinion would also satisfy the good faith standard announced in Blud-worth.
We recognize that uncertainty concerning civil and criminal liability may force affected parties to seek judicial review of the surrogate’s decision. While this may be an unfortunate intrusion into the patient’s right of privacy, we perceive the risks of civil and criminal liability as essential friction to prevent this terrain from becoming a slippery slope.
RYDER, A.C.J., and PARKER, J., concur.

. The President’s Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research presented a thorough discussion of this topic in Deciding to Forego Life-Sustaining Treatment (1983), a report on the ethical, medical, and legal issues in treatment decisions (hereinafter cited as President’s Commission Report). That report uses the phrase "surrogate decisionmaker" in recognition of the fact that the decisionmaker may not always be a guardian. President’s Commission Report at 126.

. Cases in which the religious beliefs of the patient played a significant role include: In re Quinlan, 70 N.J. 10, 355 A.2d 647, cert. denied, sub nom. Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); In re Storar, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266, cert. denied, 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981); Brophy v. New England Sinai Hosp., Inc., 398 Mass. 417, 497 N.E.2d 626 (1986). Some religious organizations have specific declarations on this subject. Declaration on Euthanasia, the Sacred Congregation for the Doctrine of the Faith, Vatican City, President’s Commission Report, app. C.

. While the diagnosis of a persistent vegetative state can now be made with some accuracy, the "primary basis" for such a diagnosis is "the careful and extended clinical observation of the patient." Position of the American Academy of Neurology on Certain Aspects of the Care and Management of the Persistent Vegetative State Patients, § 12-1, in BioLaw Update (1989). See also Cranford and Smith, Consciousness: The Most Critical Moral (Constitutional) Standard for Human Personhood, 13 Am.J. of Law & Medicine 233 (1987). Unless a consulting physician relied upon the observations of other physicians and nurses and upon the contents of prior medical records, we question the weight of a diagnosis based upon a few minutes of observation.

. The Florida act has both strong similarities to and differences with the “Uniform Rights of the Terminally Ill Act.” Unif.Rights of the Terminally Ill Act, 9B U.L.A. 609, 610 (1985). Various states have created acts with different definitions of terminal condition. President's Commission Report, app. D. Thus, precedent from other states is often distinguishable.

.Interestingly, the uniform act refers to a "relatively short time." Unif.Rights of the Terminally Ill Act § 1(9), 9B U.L.A. 609, 612 (1985). Presumably, "imminent” death is intended to include a time period which is shorter than a "relatively short time." Connecticut has recently authorized the removal of a gastrostomy tube under its natural death statute. McConnell v. Beverly Enterprises—Connecticut, Inc., 209 Conn. 692, 553 A.2d 596 (1989). However, in defining terminal condition, the Connecticut statute does not require death to be imminent but does require the condition to be in its final stage. Conn.Gen.Stat. § 19a-570(3) (1985).

. See, e.g., Idaho Code § 39-4503(3) (1988). Unif.Rights of the Terminally Ill Act § 1 comment, 9B U.L.A. 609, 612 (1985).

. We observe that, under our analysis, Mrs. Browning’s condition would be terminal if a nasogastric tube were a statutory life-prolonging procedure. Thus, it is only this single factor which precludes a statutory remedy in this case.

. Section 765.07, Florida Statutes (1987), creates an alternative procedure in cases where a living will does not exist. This procedure, however, *266 also requires an adult patient with a statutory terminal condition.

. A proposal to expressly authorize such a power of attorney is currently pending in the Florida Legislature. Fla.H.B. 1332 (1989).

. While creating no additional statutory rights for Mrs. Browning, it is significant to note that Florida now recognizes that many patients may prefer to receive "palliative and supportive care” in a hospice, rather than the full array of treatment in a hospital. §§ 400.601-.614, Fla.Stat. (1987). For purposes of hospice care, Florida has a statutory definition of “terminally ill,” which does not require that death be imminent. § 400.601(9), Fla.Stat. (1987).

.Courts and commentators have noted that these four factors are somewhat overlapping. See In re Conroy, 98 N.J. 321, 486 A.2d 1209, 1223-26 (1985). While we do not attempt the task today, we suspect that the state’s interests could be delineated in a longer and more precise list. A more precise list would assist the decisionmaker in this difficult process.

. We do not rule out the possibility that this right could be expanded by common law. L. Tribe, American Constitutional Law § 15-11 (2d ed.1988). In this opinion, however, we are creating a remedy to fulfill a constitutional right rather than some broader statutory or common law right.

. While this decision is strongly influenced by In re Guardianship of Barry, 445 So.2d 365 (Fla. 2d DCA 1984), it does not replace the In re Barry decision nor is it intended to apply in cases involving infants. The withholding of medically indicated treatment, including appropriate nutrition and hydration, in the case of children is affected by federal law. 42 U.S.C.S. § 5102(3) (Law.Co-op.Supp.1988).

. While Corbett v. D'Alessandro, 487 So.2d 368 (Fla. 2d DCA), review denied, 492 So.2d 1331 (1986), was one of the first cases to authorize the removal of an artificial feeding device, numerous states have now recognized that a surrogate decisionmaker can make this decision. Rasmussen v. Fleming, 154 Ariz. 207, 741 P.2d 674 (1987) (Arizona); Bouvia v. Superior Court, 179 Cal.App.3d 1127, 225 Cal.Rptr. 297 (1986) (California); McConnell (Connecticut); Brophy (Massachusetts); In re Jobes, 108 N.J. 394, 529 A.2d 434 (1987) (New Jersey); In re Conroy (New Jersey); In re Westchester County Medical Center, 72 N.Y.2d 517, 534 N.Y.S.2d 886, 531 N.E.2d 607 (1988) (New York); Gray v. Romeo, 697 F.Supp. 580 (D.R.I.1988) (Rhode Island); In re Guardianship of Grant, 109 Wash.2d 545, 747 P.2d 445 (1987) (Washington).

. In re Quinlan; In re Conroy; In re Farrell, 108 N.J. 335, 529 A.2d 404 (1987); In re Peter; In re Jobes; Weinberg, Whose Right Is It Anyway? 40 Hastings L.J. 119 (1988).

. Most patients to whom this opinion applies will be in hospitals or other health care facilities. President’s Commission Report at 17. As a result, we anticipate that those institutions, through bioethical committees or similar support groups, can assist the surrogate decision-maker with this process. President’s Commission Report at 160.

.Typically, suicide is an act in which the person chooses death to “solve” a monetary, family, or emotional problem for which other solutions are available. Analyzing the distinction between a legitimate right to forego medical treatment and a suicide to avoid a serious medical problem seems far more difficult. See Matthews, Suicidal Competence and the Patient's Right to Refuse Lifesaving Treatment, 75 Cal.L. Rev. 707 (1987).

. In California, a hospital which does not wish to remove a nasogastric tube is not obligated to do so if the patient can be moved to another local facility. In re Conservatorship of Morrison, 253 Cal.Rptr. 530, 206 Cal.App.3d 304 (1988). In contrast, New Jersey has required a nursing home to participate in the withdrawal of an artificial feeding device. In re Jobes.

. Thus, references in this opinion to the responsibilities of the "guardian” apply to any surrogate decisionmaker.

. It actually appears that the guardian did not believe she was empowered to make the decision and, thus, was asking the trial court to make a decision which she did not believe she could make.

. The supreme court created no rules in Blud-worth concerning notice to affected parties when the decision is made informally by a family member. We do not create any mandatory notice rules by this opinion. We anticipate that the seriousness of this decision will result in adequate notice by the surrogate decisionmaker and the medical professionals who assist. If the Department of Health and Rehabilitative Services desires notice from a health care provider, it may be able to require notice through regulation. See Fla.Admin.Code Rule 10D-29.-110(5)(h).

.We anticipate that hospitals, and other health care institutions will assist in creating an effective informal forum. See n. 16.

. See In re Westchester County Medical Center, 534 N.Y.S.2d at 896 (Hancock, J., concurring).

. We recognize that the line between competency and incompetency is imprecise. While not relevant in this case, we note that other decisions have allowed the guardian to consider the opinions and desires expressed by an incompetent person. In re Guardianship of Ingram, 102 Wash.2d 827, 689 P.2d 1363, 1370-71 (1974); In re Hier, 18 Mass.App.Ct. 200, 464 N.E.2d 959, 965 (1984).

. Recent law review articles have extensively discussed these differing standards. Scheb, Termination of Life Support Systems for Minor Children: Evolving Legal Responses, 54 Tenn.L.Rev. 1 (1986); Rhoden, Litigating Life and Death, 102 Harv.L.Rev. 375 (1988); Weinberg, Whose Right Is It Anyway? 40 Hastings L.J. 119 (1988); Morgan, Florida Law and Feeding Tubes — The Right of Removal, 17 Stetson L.Rev. 109 (1988); Merritt, Equality for the Elderly Incompetent: A Proposal for Dignified Death, 39 Stan.L.Rev. 689 (1987); Pollock, Life and Death Decisions: Who Makes Them and By What Standards?, 41 Rutgers L.Rev. 505 (1989).

. In many respects, the objective test creates a whole new dimension for the state’s interest. Under Satz v. Perlmutter, 362 So.2d 160 (Fla. 4th DCA 1978), approved, 379 So.2d 359 (1980), the decisionmaker must balance the individual’s right against the state’s interest in preserving life. The objective test seems to create a new set of state interests in eliminating life. We are not prepared today to adopt such objective standards as common law.

.It is possible that the legislature could enact a statutory framework in which objective presumptions were created to control cases in which the patient left no clear and convincing evidence of a subjective intent. Such rules arguably would be analogous to the rules governing intestate succession of property. Ch. 732, Laws of Fla. We express no opinion concerning the wisdom of such an approach. We simply believe such rules fulfill policies other than the patient’s right of privacy.